Filed 8/1/22 P. v. Lubrin et al. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JEREH CATBAGAN LUBRIN, RAFAEL RODRIGUEZ, AND MATTHEW THOMAS FARRIS,<br><br>    Defendants and Appellants. | G060424<br><br>(Super. Ct. No. C1519377)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Santa Clara County, David A. Cena, Judge. Reversed and remanded.

Law Offices of Goyette & Associates, Heather N. Phillips, Sarah E. Tobias; Goyette, Ruano & Thompson, Paul Q. Goyette and Janelle Crandall for Defendant and Appellant Jereh Catbagan Lubrin.

Rebecca P. Jones for Defendant and Appellant Rafael Rodriguez.

Eric S. Multhaup for Defendant and Appellant Matthew Thomas Farris.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jefferey M. Laurence, Assistant Attorney General, Catherine A. Rivlin, Bridget Billeter, Alice B. Lustre, and J. Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

In 2017, a jury convicted Santa Clara County Jail deputies Jereh Catbagan Lubrin, Rafael Rodriguez, and Matthew Thomas Farris (collectively, defendants) of the second degree murder of jail inmate Michael Tyree. (Pen. Code,[1] § 187, subd. (a).) The jury deadlocked on additional charges accusing defendants of assault by a public officer on another inmate, Juan V. (§ 149.) The trial court declared a mistrial on those counts, and the prosecutor later dismissed them. The court sentenced each defendant to an indeterminate term of 15 years to life.

Defendants' primary contention on appeal is that they were convicted under a since abrogated theory of murder liability and are therefore entitled to relief under the amendments made to California's murder law by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437) (Stats. 2018, ch. 1015, eff. Jan. 1, 2019 [amending §§ 188 and 189]) and Senate Bill No. 775 (2021-2022 Reg. Sess.) (S.B. 775) (Stats. 2021, ch. 551, eff. Jan. 1, 2022 [applying the amendments to all cases not yet final on appeal]).

Defendants also raise a host of other trial-related claims. These claims fall into three basic categories of alleged pretrial, evidentiary, and instructional errors. Defendants assert: (1) Pretrial Errors: the trial court erred by denying a change of venue motion and by denying Lubrin's motion to sever his case from that of his codefendants; (2) Evidentiary Errors: the trial court made several erroneous evidentiary rulings, including admitting some of the defendants' statements into evidence, admitting evidence of defendant Rodriguez's internet searches, and limiting a defense expert's testimony;

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

2

and (3) Instructional Errors: the trial court erred when it tailored instructions for the jury; it also erred in its instructions related to S.B. Nos. 1437 and 775. Lastly, defendants claim the cumulative effect of these errors, even if each was individually harmless, was prejudicial.

We agree with defendants' instructional argument which is dispositive. Like all defendants facing criminal prosecution, they were entitled to be tried under correct statements of California law provided to the jury and appropriate closing arguments for conviction made by the prosecutor. The Attorney General cannot establish beyond a reasonable doubt that the jury reached its second degree murder verdicts untainted by the incorrect statements of law included in the instructions given here. Neither the trial court nor the prosecutor erred at the time of trial because the instructions given to the jury, and which the prosecutor invoked in his closing argument, were correct at that time. Nevertheless, the changes subsequently made by the Legislature in the law of murder (S.B. 1437) are so significant for determining the individual culpability of defendants charged with serious crimes that state law mandates that those changes are retroactive (S.B. 775) to criminal judgments pending on appeal. So they apply here.

Accordingly, we reverse the respective judgments entered against each defendant and remand the case for further proceedings consistent with this opinion, including retrial at the prosecutor's election under correct jury instructions and closing arguments regarding the law of murder.

**FACTS**

We lay out the facts in some detail because resolution of this matter requires us to consider whether the jury was instructed on a factually or legally erroneous theory of second degree murder. The former involves consideration of the sufficiency of the evidence to support the jury's guilty verdicts; the latter necessitates "examining the entire cause, including the evidence, and considering all relevant circumstances . . . ."

3

(*People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*); see also *People v. Abilez* (2007) 41 Cal.4th 472, 504 [sufficiency of the evidence review].)

1. *Evidence*

On August 26, 2015, defendants were employed as Santa Clara County Sheriff's Department deputies assigned as correctional officers to the main county jail in San Jose. Farris and Rodriguez were hired in 2013, and Lubrin was hired in 2012.

On-duty correctional officers at the jail wore utility belts, which held mace, a flashlight, handcuffs, and a "yawara" stick. A yawara is about eight inches long, with a patterned grip and rounded wooden ends. When doing cell checks, officers used their yawaras to tap on cell bars.

Testimony and documentary evidence that we excerpt below established that ensuring the safety and protection of inmates was a core responsibility of correctional officers. They were required to conduct inmate welfare checks every hour to ensure that "the inmate's okay and not in need of any medical attention. Breathing, alive." If an inmate was injured or in physical distress, a "man down" call to jail supervisors was to be made expeditiously, typically by radio.

Use of force by correctional officers was highly regulated. Any infliction of pain on an inmate had to be documented, and procedures required classifying and reporting any forcible contact with an inmate. Injuries to inmates required more extensive and formal narrative reports. Correctional officers were "allowed to use that force which is objectively reasonable, given the facts and circumstances . . . to bring a situation under control."

When there was no imminent threat from an inmate, correctional officers were expected to contact a supervisor if they believed circumstances could deteriorate to the point where force might become necessary. If officers did use force on an inmate, as soon as the threat was eliminated, "the inmate should be seen by a nurse immediately to

4

either render first-aid, if it's necessary, or to determine that it's not necessary, that there was [*sic*] no injuries." "Whenever there is any type of pain compliance on a subject, we are going to go and get medical aid for them."

All correctional officers, including defendants, received extensive academy training on use of force in the jail. They were instructed on which body parts to target, and which to avoid in order to minimize the chance of inmate injury. Specifically, officers were taught not to hit an inmate's midsection which could risk harm to internal organs. Officers were forewarned a blow to that area of the body could cause serious injury or death. However, they were allowed to kick an inmate's abdomen "to gain distance and time" and allow assessment of the situation. They were trained on how to use their yawaras to apply pressure to sensitive points on an inmate's body, but they were directed not to use the stick as a striking weapon, particularly on those parts of the body where damage to internal organs could result.

Correctional officers were also obligated to be alert for inmates with mental health issues, including suicidal behavior, and to refer those inmates for mental health assessment and services. Special clothing and "suicide watch" provisions were available for such inmates.

Michael Tyree was booked into the jail on July 11, 2015, on unspecified "warrants." Although a previous booking classification for Tyree had included mental health/suicidal codes, the July 11 booking classification did not. Thus, Tyree was not assigned to the "acute psyche ward" of the jail; instead, he was housed in a general population module in the main jail.

The module was a two-tiered dormitory that contained 48 cells. Tyree occupied a cell on the lower level, which measured approximately 12.5 feet long, six feet wide, and eight feet high. It had a hinged door that opened outward, a toilet/sink fixture, and a metal-framed bed. There was a barred window on the back wall, and a small wooden desk with a stool. Each cell was equipped with an interior call button to alert the

module's duty officer. The bed, stool, and toilet were less than two feet high, the table less than two feet, five inches, and the sink was two feet, eight inches tall.

Tyree suffered from mental illness. Other inmates in the module unit helped take care of him by giving him extra food when they found him eating out of the garbage, and by giving him soap to encourage him to shower. One inmate described Tyree as someone with "special needs," or, "[a] normal person that's not all there." Another inmate said he knew Tyree was a "J Cat"—jail slang for a mentally ill inmate—and felt sorry for him because he did not bother anybody and kept to himself.

On the night of August 26, 2015, defendants were on duty and assigned to the module in which Tyree was housed. Between 7:20 and 8:00 p.m., a jail nurse conducted "pill call" to distribute medicine to inmates in the module. Tyree became confrontational with the nurse, and one inmate recalled Tyree making offensive comments to the nurse. Another inmate testified that Lubrin, while watching this encounter, was "smirking."

A commissary exchange took place between 8:19 and 8:59 p.m., followed by a clothing exchange for inmates to obtain fresh clothing items. The module's inmates were locked down in their cells sometime after 10:00 p.m.

Inmates testified Lubrin returned with Farris at about 10:30 p.m. to perform "bar checks," or cell "shakedowns," looking for contraband. A surveillance camera at the duty station pointed into the module, and a video recording from that night showed Lubrin and Farris entering the module at 10:38 p.m., followed by Rodriguez at 10:48 p.m.

Juan V. was an inmate in the same module, who was also considered to be mentally ill. When Lubrin and Farris got to Juan's cell, several inmates testified they heard him "screaming, like, he was getting beat up." One inmate testified he heard Juan scream: "'Ah, get off of me. Ah, ah.'" Inmates testified Rodriguez joined Lubrin and

6

Farris in Juan's cell. They said Juan continued to scream for several minutes; one inmate said that it sounded like Juan "was getting roughed up."

Juan V. testified that Lubrin entered his cell that night and, after accusing him of unruly behavior on another occasion, hit him in the mouth with a closed fist. He said defendant Rodriguez then hit him in the head, and when he got back to his feet Lubrin put him in a headlock. Juan said all three defendants began punching him at that point; he was thrown against the wall, and someone twisted his arm. Defendants then threw him onto the bed, where Lubrin kneeled on his back and punched him in the back of the head.

Other inmates heard the confrontation. They testified Juan yelled, "'Please stop. Stop.'" "'I am a bitch. I am a bitch.'" "'Leave me alone,'" and "'Stop.'" "'Stop hitting me,'" and "'Stop slapping me, I'm not a bitch.'" They also heard slapping sounds. One inmate testified he heard defendants ask Juan "why he was acting up." Juan testified that defendants eventually left him in his cell.

The inmates indicated defendants then walked down to the lower tier and started cell searches. They worked their way along, searching cells, and one inmate remarked: "They went to Tyree's cell, and it was all bad."

Inmate Kevin L. was in the cell adjacent to Tyree's. He testified that, while conducting the cell searches, Farris stopped at Tyree's door and said, "'I tell you to do something, I mean fucking do it.'" All three defendants then entered Tyree's cell. Tyree told them to leave him alone. Kevin heard the sound of "somebody being rushed, a lot of thumping around, and the bed, you know, somebody got basically, you know, tackled on the bed . . . ." Tyree was saying, "'Oh, no. Fuck. Get off me. Oh, my God,'" and there was "a lot of screaming." The screaming was loud: "[a] good 7" on a scale of 1 to 10. Kevin said Tyree screamed, "'Stop'" several times, yelling "'Please. Oh, God. Stop. Please. Jesus. Oh,'" and "'Stop. Please. I'll be good.'" Kevin testified it sounded like defendants had slammed Tyree against the wall. He also heard what sounded like blows

7

being delivered to Tyree's body, making dull thudding sounds. He said Lubrin then told Tyree to stay quiet the rest of the night, turned out the light, and left the cell.

Fifteen seconds after defendants went into Tyree's cell, one inmate said, "Tyree started screaming for his life." Another inmate said he saw Tyree's cell door was ajar when the screaming started. Another said that when defendants reached Tyree's cell, "I heard screaming again. So I got up, and I looked out my cell door, and I just seen Tyree's cell . . . the cell was open, and I heard him yelling, 'I'm sorry for whatever I did. Please just stop hitting me.' That pretty much sums it up." An inmate also recalled Tyree loudly screaming, "'Ow. Help. Help. Stop. Stop,'" and another inmate said Tyree's screams were "[w]ay louder" than Juan V.'s had been.

One inmate testified all three defendants were in Tyree's cell when the loud sounds were heard. He said the sounds were clear: "He was just screaming, 'Help. Stop. Please stop. Help.' And all you heard was 'boom, boom,' and I was, like, 'Oh shit.'" Another said he heard "thumps." One heard Tyree saying, "'Please. I'm sorry. I'm sorry,'" while another heard Tyree yelling, "'Stop. Sorry,'" so loudly that he felt sure "the whole pod heard it." Four other inmates in the module testified they could also make out the words, "'I'm sorry,'" amidst the screaming.

"Obviously . . . he was being hurt," one inmate testified. Another said Tyree was screaming "like, he was in pain"; another heard Tyree yelling "really loud," and said it "sounded like a voice in pain." According to another inmate: "He was begging and screaming. Sounded like he was in a lot of pain." That inmate summarized, "it sounded like a little kid crying." He explained, "Like, I don't know. Like, you could just feel his pain when you heard him scream."

Tyree's screams lasted about four to five minutes. At some point during the incident, one of the three defendants partially closed Tyree's cell door and stood at the threshold. Several inmates testified they saw or heard the lights in Tyree's cell go off, his cell door close, and defendants walk away. These inmates also testified they heard

8

one of the defendants say something along the lines of, "I don't want to hear a word out of you all night."

Inmates in the module stood watching at their cell doors. Several inmates said defendants quickly finished their other cell searches and left the module. Inmates started talking to each other from their cells about what had happened; one testified "[e]verybody knew" that Tyree had been killed.

The surveillance video showed defendants walking out of the module at about 11:09 p.m., dropping items they had been holding. The lights in the module went off within a minute. The video showed defendants removing their gloves; Rodriguez appeared to be smiling.

Back in the module, Kevin L. said he spoke to Tyree "till he died." He said when he asked Tyree if he was all right, Tyree responded "'it hurt,'" and Kevin could hear him crying. Tyree seemed to be "in a lot of pain." Tyree said he was "'sick and tired of being beat up. If they want to kill me, I should just kill myself.'" Kevin said he could tell Tyree "was pretty hurt," and suggested he drink some water. He heard Tyree slowly pacing back and forth in his cell; he also heard Tyree run water from his sink and flush the toilet. About 15 or 20 minutes after defendants left Tyree's cell, Kevin heard a "thud."

The inmates said Lubrin returned to the module about an hour later to conduct routine inmate welfare checks. At 12:07 a.m., the surveillance video showed Lubrin reentering the module. Officers were required to perform welfare checks every hour, to ensure that inmates were alive and healthy. If they found an inmate in distress, protocol required them to notify jail supervisors and "render immediate first-aid . . . ."

Lubrin kicked at Tyree's door a few times, called Tyree's name, and made what several inmates described as nudging kicks while saying, "'Hey, hey.'" One inmate heard Lubrin say, "'Get up, Tyree. You stink.'" He returned to Tyree's cell and yelled, "'Get up.'"

9

Lubrin left, and came back with Farris and Rodriguez. At 12:10 a.m., Rodriguez was shown in the video picking up a phone handset at an officers' station. The video showed Rodriguez and Lubrin interacting near the entrance to the module. The lights in the module remained out.

The video showed Rodriguez putting on gloves, then walking away from the module while Lubrin remained at the doorway for approximately 18 seconds. Rodriguez then picked up the logbook and walked toward the module. Just before 12:12 a.m., Farris appeared behind the officers' station.

According to the watch commander's log, a "man down" call was transmitted at 12:12 a.m., five minutes after Lubrin reentered the module. Inmates said Lubrin dragged Tyree out of his cell and began CPR. Tyree was naked.

At about 12:13 a.m., two other officers appeared on the video, heading toward the module. The module lights went on about 30 seconds later. Jail protocol was to illuminate the area when an incident occurred for the safety of responding staff and to facilitate the provision of aid. A medical team responded around 12:14 a.m.; Tyree was pronounced dead at approximately 12:35 a.m. At 1:01 a.m., Farris placed a cell phone call to Lubrin.

When investigators reached the scene, Tyree lay dead on the floor of the module near his cell. His cell door was open, and there was vomit and feces everywhere. No noose or ligature material that could have facilitated suicide was found in the cell, but there was handwriting on the wall.

An inmate testified inmates were later able to interact, and he remembered "people [were] saying, 'Oh, it's crazy. They killed that dude.'" "'Oh, shit. They fucking killed him.'" Later that morning, two inmates went to the day shift officer assigned to the module and reported witnessing Tyree's murder.

Meanwhile, defendants had ended their shift at 6:00 a.m. At 6:04 a.m., and again at 6:29 a.m., Farris called Lubrin from his cell phone. At 6:28 a.m., an internet

10

search was performed from Farris's phone. The Google query was, "'What happens when you eat poop?'" At 6:45 a.m., Lubrin and Farris texted each other. Lubrin said, "'Shit,'" and asked, "'Where is "Rod?"'" Farris sent a text reading, "'We waited for you and called, man.'" Lubrin suggested they meet before work that night.

At 7:11 a.m., and again at 12:48 p.m., Farris texted correctional officer Corey E. asking for an update on the situation at the jail. Starting at 8:37 a.m., internet searches were conducted from Rodriguez's cell phone. The initial Google query was, "'Can you die from punches to you.'" The search engine's auto-correction feature suggested, "'Can you die if someone punches you in the armpit,'" and the user clicked on those revised search terms. A second search began with the query, "'Can you die if someone punches you in the rib?'"

Defendants started their shifts at the jail that evening at 6:00 p.m.; they were pulled off duty at 10:00 p.m. Earlier, the day shift module officer had responded to a text message from Lubrin asking for information; they spoke on the phone. When told that he was being investigated in connection with Tyree's death, Lubrin was not alarmed. He responded that he would be okay because "[h]e had two other officers in there that have his same story."

Dr. Joseph O'Hara of the Santa Clara County Medical Examiner-Coroner's Office responded to the county jail following notification about Tyree's death. He found Tyree's body on the floor of the housing module. He said there was vomit and feces "everywhere," and there was evidence jail personnel had attempted to resuscitate Tyree. Nothing about the scene suggested to O'Hara that the manner of death was suicide, including the content of writings left on the walls of Tyree's cell.

O'Hara performed an autopsy the following day. Tyree had two lacerations on his face, and a bruise to his cheek. The lacerations—one near the right eyebrow and one on the left side of the chin—were blunt force injuries that had bled, indicating

11

infliction at or about the time of death. The bruise on his left cheek was also caused at or near the time of death.

There was a "large hemorrhage" to the muscle on the left side of Tyree's skull where it attached to the jaw. It resulted from an impact to that side of his head around the time he died. The presence of injuries on both sides of Tyree's head suggested that they had not been incurred in a single event, such as a fall.

Abrasions, contusions, and lacerations covered the front, back, and both sides of Tyree's body. Two abrasions and several contusions on Tyree's back were received about the time of death. There was also an abrasion on Tyree's right clavicle and a bruise in his right armpit. O'Hara observed "at least four separate areas of hemorrhage into . . . soft tissue" underneath the back contusions, as well as "at least three" areas of hemorrhaging from broken blood vessels in the underlying muscle. There were abrasions on Tyree's right shoulder similar in pattern to other abrasions O'Hara had documented on his back and hip. There were multiple abrasions on both hips and the right ankle, one on the right thigh, and three on the lower right leg. There were additional contusions on Tyree's left thigh, right knee, lower right leg, lower left leg, and right ankle.

Internally, there was a "significant" laceration to the front of Tyree's liver, covering more than six square inches and extending about one inch deep. O'Hara said, "If I had an individual in a car crash with only that injury, unless the accident happened in front of the hospital, they probably would bleed out and be dead in a matter of minutes." O'Hara found over 2,000 milliliters of blood in the cavity between Tyree's abdominal wall and internal organs, an amount which comprised 40 to 50 percent of Tyree's blood. He opined a liver injury like Tyree's could have been caused by a blow to the abdomen that crushed the back of the liver against the bony spinal column, a blow to the back while the person was lying on the ground, or possibly forceful application of

CPR. However, having watched a video of the CPR performed on Tyree by jail personnel, O'Hara said he did not observe responders pressing on his abdomen.

Tyree also suffered a "catastrophic laceration of his spleen." It was lacerated to a depth of one inch, across its upper third, and the spleen was "almost torn in half." Half an inch more on either side and "the spleen would have been torn in two pieces." This was consistent with either an acceleration injury, where "something impacted his abdomen with a great deal of force," or with a crushing injury. O'Hara testified that "liver and spleen lacerations are the least frequent complications of CPR," and referred to an article that found CPR-related injuries "to the liver, spleen, pancreas, stomach, and intestinal lacerations are rare."

O'Hara also observed hemorrhaging in the lining where the stomach joins the esophagus, as well as in Tyree's small intestine. He said a person who suffers injuries to the spleen and liver, resulting in bleeding into the abdominal space, will experience significant pain, will vomit and uncontrollably expel feces and urine, and ultimately slip into unconsciousness. Even so, the victim could still be ambulatory before losing consciousness.

O'Hara concluded Tyree's death was caused by "multiple blunt force injuries to include visceral lacerations and hemoperitoneum," and he stated the manner of death was homicide. He counted 34 separate injuries inflicted on Tyree, including "a catastrophic abdominal injury from either being crushed or a blow into the abdomen." He estimated Tyree's death occurred between five and 50 minutes after infliction of the injuries.

O'Hara dismissed a suggestion that Tyree's injuries resulted from a fall in his cell: "[W]hether he was dizzy or not, it's impossible for him to have fallen 18 or 15 feet and ruptured his own spleen." A fall from three feet off the ground would not generate sufficient force to lacerate a spleen. Having examined about 8,000 bodies and conducted about 4,000 autopsies, O'Hara stated, "The only time I [have] ever seen a

13

spleen rupture is when they're hit by a train, they're in a car crash, they fall off a roof, or they're beaten to death."

DNA analysis of a swab collected from Rodriguez's yawara stick was compared to profiles of Tyree and Rodriguez. The results indicated a mixture of DNA from at least three contributors. Assuming there were two major contributors to the mixture, it was 460 quintillion times more likely to see those DNA data if the sources were Tyree and Rodriguez than if the sources were two unknown people. Lubrin's yawara stick showed a mixture of DNA, but Tyree was excluded as a potential contributor.

C.B. testified he had known Lubrin since 2013 from the military reserves and they saw each other monthly. Lubrin talked about his work at the jail, and told C.B. that "he was very rough" in his physical interactions with inmates, that inmates were scared of him, and that he had received complaints concerning use of excessive force. Lubrin said that "'[b]eating people up is part of my job at the jail.'" Lubrin told C.B. about an incident where an inmate had hit a correctional officer, and in reprisal a group of officers, including Lubrin, took the inmate to a separate room without cameras and took turns punching him. C.B. said Lubrin made this type of activity seem like it was a common occurrence. Lubrin also told C.B. he sometimes used the knob end of his yawara stick on inmates because "it hurts more."

Investigators executed search warrants at Rodriguez's and Farris's residences. Among other items, they seized cell phones, and investigators extracted data from the phones. That same day, investigators located Lubrin and seized his cell phone. A digital forensics expert examined Lubrin's phone; the expert was unable to extract data from it because it had been cleared and restored to its "factory setting." All personal information, including call records and text messages, had been deleted.

Before Tyree's August 26 death, on June 15 Farris exchanged text messages with another staffer at the jail, indicating that certain behavior from inmates

"'downtown'" would result in a "'full-blown, beat the fuck down.'" When the other staffer complained that restraint had been required because "'there were two cameras rolling.'" Farris replied that "'[c]ameras suck.'" On July 11, Farris and another person discussed the need to "'handle[]'" inmates who "'mess[] with'" correctional officers. He also texted that he had "'just pulled a dude out'" and "'had to show him some love.'" On July 12, Farris texted a coworker, "'We been breaking fools off this week.'" On July 15, Farris texted, "'We just had a good fight. Hella OC S-p-r-s-y [*sic*].'" A minute later, Farris texted, "'Lubrin sprayed a guy, so much OC Spray.'" On July 20, Farris received a text from a colleague reporting that he was "'going to start pulling people out at 2:00 a.m. for no reason to twist them up.'" Farris replied, "'Come to the 6th [Floor], bro'" and "'We do it at 0001, not 0200.'"

On July 24, Farris texted Rodriguez and recommended that Rodriguez "'just twist fools up but write paper.'" Farris accused coworkers in Rodriguez's unit of being "'[i]nmate lovers,'" noting that he "'love[d]'" his assignment on the sixth floor because there was "'no camera and no groups . . . .'" A few minutes later, Rodriguez described to Farris, and expressed amusement over, how Rodriguez slapped an inmate and said, "'I am the wrong guy to fuck with.'" Farris replied, "'Bahaha, Dude, fuck those clones. Get rolled up but don't get in trouble.'" Farris then offered advice to Rodriguez about a person who could "'teach you about what you do and who you do it in front of.'" Rodriguez concurred.

On July 27, Lubrin participated in a text message exchange discussing how deputies "smashed" an inmate, and then Lubrin wrote, "'But [Juan V.]!!!! Smashed shit on his face, hahahahahahahaha.'"

On July 30, Rodriguez texted Ferris and reported having "'popped'" and "'twist[ed] up'" an inmate who said "'llaves'" to him. Farris expressed amusement. On August 1, Farris observed in a text message that, "'[i]n jail, if you don't empty your can [of pepper spray], p-p-l talk shit about you. Lol.'" On August 8, Farris texted that he had

15

been questioned "'on hella shit'" by his superiors after he "'intuned a guy up'" and the inmate broke his cell window.

On August 12, Farris complained to a colleague that he was going to "'get scolded today for a hands-on incident that happened last week, Lol.'" Farris agreed that he would be "'fine'" because there was "'[l]ots of use of force.'" On August 13, Farris reported by text that jail was "'[c]ool'" because he "'pulled a guy out.'" The other person on the exchange replied, "'Nice little dinnertime scuffle.'" On August 14, Farris sent a text message to a colleague noting that an inmate "'is terrified of me,'" and expressed amusement ("'Hahahahahaha'") about how he "'got into it'" with an inmate, "'[s]creamed at him and locked him down, bro.'" Also on August 14, Farris and a coworker commiserated about an inmate, and Farris said, "'I screamed at him, Bahahaha,'" and "'Haha, that guy's a bitch, man. Totally submissive.'" On August 15, Farris reported to the coworker that he and others "'handled'" an inmate named Vargas. After the coworker said he "'wanted to hit him today,'" Farris reassured him: "'We got him, bro, he was a bitch, haha. I told him, you want to fuck with my partners, fool.'" On August 17, Farris responded to a text about the need to "'reclaim the town'" by noting that, "'in jail, bro, we don't even wait a second, like l-g-b-g, it's hand-on so fast, bro.'" His coworker advised Farris to "'pump the brakes'" so he did not "'have to write so much . . . .'" Farris commented, "'Lol. I had to drop some pain on this guy one time.'"

Following the close of the prosecution's case, defendants introduced testimony from four expert witnesses who criticized the adequacy of the investigation, the conclusions of the coroner, and whether the inmates could have heard what they testified to have heard from their vantage points. One expert opined Tyree's death was either an accident or suicide, but not a homicide.

In the prosecution's rebuttal case, Michelle Jorden, the chief medical examiner for Santa Clara County, testified as an expert in forensic pathology, neuropathology, and identification of pattern injuries. Jorden conducted a

16

neuropathologic examination of Tyree's brain, and reviewed O'Hara's autopsy report, investigation photographs, and the CPR video. Jorden concluded Tyree's manner of death was homicide, caused by multiple blunt force injuries, explaining that the absence of broken ribs did not preclude infliction of blunt force injuries. In addition, Jorden opined Tyree's liver injury resulted from blunt force applied to his abdomen, and not from administration of CPR.

2.    *The Jury Instructions as Restated in the Prosecutor's Closing Arguments*

During his closing argument, the prosecutor told the jury:

"Here's what the definition of murder is for our purposes here. Every person who unlawfully kills another human being with malice aforethought is guilty of murder. . . . [¶] So part [1] is someone did something that caused the death or had a duty to do something, didn't do it, and that contributed or was the cause of the death. That's part 1. [¶] . . . [¶] Part 2 is this: When the defendant acted or failed to act, he had a state of mind called malice aforethought. [¶] Now what does that mean? Well, there's different kinds. Malice can be either express or implied. . . . [¶] [I]mplied malice [is] what we have in this case. That's what applies here. . . . The defendant acted with implied malice if the following is shown: (1), he intentionally committed an act or failed to act. . . . [¶] (2), the natural and probable consequences of the act or omission were dangerous to human life. . . . [¶] . . . Do we have that? Of course we do. Someone is physically beaten to the point where their internal organs are either ruptured or damaged. Is the natural probable consequence of that, is the foreseeable result of that that it's dangerous to human life? Of course. Of course it is. So we have that. [¶] (3), at the time that he acted or failed to act, he knew doing so was dangerous to human life. Now, do we have that too? Yes, we do."

"[I]t is someone who engaged in dangerous activity they were taught not to do, and the circumstances of it, told them that it was dangerous, and then went ahead and

17

did it and didn't do anything after the fact to comfort or get help, care, anything of the sort. [¶] . . . [¶] What's element 4? He deliberately acted with conscious disregard. Do we have that? Yes, that's easy. . . . They either deliberately did the assault with awareness, or they deliberately did nothing and walked away with no care or no concern."

"We have, in this case, shown what is called second degree implied malice murder: Actions or failure to act coupled with what is called malice aforethought, meaning awareness that it's dangerous and doing it anyways." "[T]he evidence shows that [implied malice] applies to all three [defendants], because all three were in the cell . . . when the assault happened; so have an awareness of . . . what went down in terms of force and where the body was hit. All three of them have this training that tells them to avoid certain parts of the body. It applies to all three."

The prosecutor then segued back into the now-abrogated natural and probable consequences (NPC) theory of liability. After explaining that under the "'natural and probable consequence[s]'" doctrine, "if . . . someone else in your group ends up committing another crime" that you, i.e., the defendant, did not intend to be committed, the defendant "can still be responsible—*is* responsible for the greater crime" (italics added), despite lacking any intent for that crime to be committed.

## DISCUSSION

1. *Theories of Guilt at Trial; Subsequent Enactment of Senate Bill Nos. 1437 and 775*

The prosecution presented evidence, and the jury was instructed on, one theory of first degree murder and two theories of second degree murder. The jury's second degree murder guilty verdict for each defendant indicates it rejected the prosecution's theory of first degree felony murder based on burglary, i.e., that defendants each crossed the threshold of Tyree's cell specifically intending to commit a felony

18

against him and they caused his death while committing that felony. (§ 189; see CALCRIM No. 540A.)

The trial court's standard instructions and verdict forms did not require the jurors to agree on a theory of second degree murder. Nor did the instructions require jurors to specify the theory on which they relied in reading their verdicts. The trial court's instructions gave the jury two alternative theories regarding second degree murder. The first involved implied malice murder in which each defendant acted with malice aforethought to cause Tyree's death. (§ 187; see CALCRIM No. 520.) The alternative theory involved a second degree murder based on an aggravated assault or an assault under color of authority during which a person in each defendant's position would have known that murder was a "natural and probable consequence" of such an assault. (§§ 245, subd. (a)(1); 149; see CALCRIM No. 403.)

While the latter was a valid theory when this case was tried, the Legislature has since amended the Penal Code to eliminate NPC liability for murder (S.B. 1437), and to permit defendants to rely on that change in the law to challenge their conviction on direct appeal (S.B. 775), as defendants do here.

The Attorney General does not dispute that defendants are entitled to the benefit of the changes made by S.B. 1437 and S.B. 775, or that, under the new law, the jury was erroneously instructed on the NPC theory of second degree murder. But the Attorney General argues that since the jury was also instructed with a still-valid theory of second degree murder liability—implied malice murder, any error arising from the trial court's instructions on the NPC theory was harmless. We must disagree.

2.    *Legal Background*

A.    *Natural and Probable Consequences Doctrine*

Before the passage of S.B.1437, "the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense

19

committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248.)

S.B. 1437 "eliminate[d] natural and probable consequences liability for first and second degree murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 849.) Indeed, "the natural and probable consequences doctrine authorizes precisely what Senate Bill 1437 forbids: it allows a fact finder to impute malice 'to a person based solely on his or her participation in a crime.' [Citation.] Under the doctrine, 'individuals lacking the mens rea and culpability for murder [are] punished as if they were the ones who committed the fatal act.'" (*Id.* at p. 847.)

S.B. 1437 made "personally possessing malice aforethought a necessary element of murder. Natural and probable consequences liability for murder contains no such requirement. [¶] The language of section 188(a)(3) [as enacted by S.B. 1437] requires a principal to 'act with malice aforethought' in order to be convicted of murder, making no exception for accomplices or second degree murder. [Citation.] By its terms, section 188(a)(3) permits a second degree murder conviction only if the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought. The prosecution cannot 'impute[] [malice] to a person based solely on his or her participation in a crime.'" (*Gentile, supra,* 10 Cal.th at p. 846.)

B.     *Implied Malice Murder*

In a homicide, "the dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.) Thus, "in a homicide prosecution *not* involving felony murder or the natural and probable consequences doctrine, the

20

aider/abettor's guilt is based on the combined acts of all the principals *and on the aider/abettor's own knowledge and intent*." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917 (*Amezcua and Flores*), italics added.) Whether the jury evaluated each defendant's "own knowledge and intent" in convicting each defendant of second degree murder is the key consideration for our review.

Malice aforethought is the defining characteristic of murder (§ 187), and malice may be express or implied (§ 188). "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) "'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Thus, "to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act," but need not specifically intend "the result of that act," i.e., the victim's death. (*People v. Powell* (2021) 63 Cal.App.5th 689, 713.)

S.B. 1437 did not repeal the law imposing criminal liability for implied malice murder. (*Gentile, supra*, 10 Cal.5th at p. 850.) To the contrary, "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Ibid.*)

To return a guilty verdict using an implied malice theory, the jury must make an individualized assessment of each defendant's mental state. Implied malice murder "'depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.'" (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1142.) Unlike the NPC doctrine, the implied malice theory of murder "requires that the

21

prosecution demonstrate the defendant in fact acted with malice." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 106 (*Nieto Benitez*).) In other words, because "the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988), this determination must be made for each defendant personally—not collectively.

None of the defendants contend the evidence was insufficient as a matter of law for a jury to determine each had the requisite mental state for implied malice second degree murder. Jurors "may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act." (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 107.) Considering "the combined acts of all the principals" (*Amezcua and Flores*, *supra*, 6 Cal.5th at p. 917), and the degree of each defendant's awareness of and participation in the others' actions, could indicate "'a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*Cravens, supra,* 53 Cal.4th at p. 507). The jury was properly instructed on the necessity of finding each defendant harbored the conscious disregard for life necessary to constitute implied malice murder. (CALCRIM No. 520; see also CALCRIM No. 203 ["You must separately consider the evidence as it applies to each defendant" and "You must decide each charge for each defendant separately"].) Consequently, the dispositive issue on appeal is whether we can determine from the record that the jury based its murder verdict for each defendant on implied malice rather than the now-invalid NPC theory.

C.      *Alternative-Theory Error*

Whether the jury based its verdict on a legally adequate theory of guilt, or on one contrary to law is commonly described as an issue of "'alternative-theory error.'" (*Aledamat*, *supra*, 8 Cal.5th at p. 7, fn. 3; see *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61

22

[same terminology].)  Our Supreme Court has distinguished two situations in which juries are instructed on theories of guilt that cannot support a conviction.  (*Aledamat*, at p. 7; *People v. Guiton* (1993) 4 Cal.4th 1116, 1128 (*Guiton*).)  A *factually* inadequate theory "'is an otherwise valid legal theory that is not supported by the facts or evidence in a case.'"  (*Aledamat*, at p. 8.)  A *legally* inadequate theory "is incorrect because it is contrary to law"; for example, as when the theory on which guilt is alleged ""'fails to come within the statutory definition of the crime.'""  (*Id.* at p. 7.)

Of the two types of error, the former is "'less likely to be prejudicial because jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories.'"  (*Aledamat*, *supra*, 8 Cal.5th at p. 8.)  Legally incorrect theories, by contrast, require a more critical appellate analysis because jurors are less able to identify an incorrect statement of the law.  (*Ibid.*;  *Guiton*, *supra*, 4 Cal.4th at p. 1125.)  "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground."  (*People v. Chiu* (2014) 59 Cal.4th 155, 167, superseded by statute on other grounds as stated in *Gentile, supra*, 10 Cal.5th at p. 845-847.)  Reversal is required in such instances because, where ""'jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.'""  (*In re Martinez* (2017) 3 Cal.5th 1216, 1224.)  Consequently, legal error is "subject to the rule generally requiring reversal."  (*Guiton*, at p. 1128.)

4.      *Harmless Error—Chapman Standard*

The federal constitutional standard of review under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) that applies when there has been an omission or misdescription in the jury instructions of the elements of the offense also applies to alternative-theory error.  (*Aledamat*, *supra*, 8 Cal.5th at p. 9.)  That standard requires reversal unless the error was harmless beyond a reasonable doubt.  (*Ibid.*)

23

Presenting the jury with alternate theories of guilt, and validating by means of jury instructions each alternative as a legitimate theory to support a conviction "is not the type of error that can be rendered harmless by 'overwhelming' evidence of guilt alone." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 399.) "The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887.)

Put another way, "[t]he question is not whether we believe it clear beyond a reasonable doubt that the defendant is guilty under the legally correct theory, but whether we can say, beyond a reasonable doubt, that the legally incorrect jury instruction did not taint the actual jury verdict. [Citation.] It is the People's burden to show that the jury relied on the legally valid theory in convicting the defendant." (*People v. Baratang* (2020) 56 Cal.App.5th 252, 263 (*Baratang*).)

"Under *Chapman*, we . . . take particular note of a prosecutor's closing arguments." (*In re Loza* (2018) 27 Cal.App.5th 797, 806 (*Loza*).) This attention follows because any "'likely damage is best understood by taking the word of the prosecutor . . . during closing arguments'" (*ibid.*) as to what facts and theories warranted the jury's focus—including which instructions applied and how to apply them (see *People v. Powell* (2021) 63 Cal.App.5th 689, 715 ["Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless"]).

Here, reversal is required because, relying on the NPC doctrine, the prosecutor expressly recognized jurors might conclude one or more of the defendants "didn't have all this—the other requirements" of implied malice murder, but nevertheless urged the jury to find guilt because of what "[t]he law says" regarding "what they call a 'natural and probable consequence' . . . ."

24

Specifically, after discussing the "components" of implied malice murder, which the prosecutor adequately defined as "meaning awareness that it's dangerous and doing it anyways," the prosecutor invoked the NPC doctrine as an alternative theory for second degree murder: "But just for argument purposes, let me walk you through—if you said to yourself, 'Well, what if only the person who actually—what if only one of them did the beatdown and the others wanted only to help an assault? They didn't have all this—the other requirements? What does the law say about this?"

The prosecutor then answered his own question: "The law says that if you set out to engage in one crime, and someone else in your group ends up committing another crime, if that other crime is what they call a 'natural and probable consequence,' it means foreseeable that that's what could happen under the circumstances, that person can still be responsible—is responsible for the greater crime. Why is that? Because the law says there's certain types of behavior we just don't want any—we want to frown upon, we don't want to engage in, [such as] we don't want gang members going to, you know, one place to start a fight knowing that it could easily escalate into something, you know, lethal, after the fact. So we say that if you start with a mindset of one crime and someone else in that group commits another crime, if that was foreseeable, then that person is also responsible for the greater crime." The prosecutor stressed the NPC theory as an alternative to first degree felony murder and implied malice second degree murder: "And that is," he argued referring to the NPC doctrine, "at the bare minimum, what we have in this case . . . ."

The prosecutor may have argued more vigorously for felony murder or implied malice murder as the basis for murder convictions of each defendant, but that does not mean his reference to, and reliance upon, the NPC doctrine was harmless—let alone harmless beyond a reasonable doubt. He clearly argued the NPC doctrine provided a "minimum" basis on which to secure a conviction; we cannot with any confidence conclude based on this record that the NPC theory did not tip one or more jurors toward a

guilty verdict after the jury had rejected first degree murder. Guilt "based on implied malice [is] a far more difficult route to a second degree murder verdict than the natural and probable consequences doctrine." (*People v. Powell* (2021) 63 Cal.App.5th 689, 717.)

We agree with the Attorney General that the jury's guilty verdict for second degree murder indicates it concluded at least one defendant harbored the implied malice necessary to constitute murder. The Attorney General leaps from this predicate, however, to the conclusion that because the evidence was sufficient to convict one defendant, it was sufficient to indicate the jury's intent to convict them all, given—according to the Attorney General—little reason to distinguish among them based on their actions and each deputy's actual or imputed knowledge. That, however, is not what the prosecutor and the now-abrogated NPC instruction told the jury. Together, they both told the jury that, contrary to the law of murder, it could dispense with evaluating any particular defendant's intent and instead convict him based on a colleague's malice. The law now prohibits such convictions.

In closing, we will restate an observation we made earlier. The evidence before us would be sufficient to support these second degree murder verdicts based on a traditional "implied malice" theory. It is, nevertheless, impossible for us to determine based on this record that no juror relied on the discredited NPC theory in reaching these second degree murder verdicts. The NPC theory provided to the jury by the trial court and specifically invoked by the prosecutor, removed from the jury the critical task of determining any defendant's subjective risk awareness as the fatal events unfolded inside Tyree's cell. (See *Chiu*, *supra*, 59 Cal.4th at p. 164 ["'because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime'"].) This contravenes the purpose of S.B. 1437, which was enacted to ensure "that a person should be punished for his or her actions

26

according to his or her own level of individual culpability." (Sen. Conc. Res. No. 48, stats. 2017 (2017-2018 Reg. Sess.) res. ch. 175, ¶ 3.) "Because the prosecutor urged the jurors to consider and utilize the natural and probable consequences theory, we cannot find beyond a reasonable doubt that [none] of the jurors may have relied upon it." (*Loza*, *supra*, 27 Cal.App.5th at p. 806.)

## DISPOSITION

The judgments are reversed, and the matter is remanded for proceedings consistent with this opinion. On remand, the prosecution may elect to retry defendants on a valid theory or theories of homicide with a properly instructed jury.[2]


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


MARKS, J.*

\*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[2] Because we reverse for *Aledamat* error, we need not and do not address defendants' other claims. (See *Baratang, supra,* 56 Cal.App.5th at p. 265, fn. 8.) Should the matter be retried, those issues may be revisited and resolved in the trial court.